**AFFIRM; Opinion Filed February 5, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-16-00610-CR
No. 05-16-00611-CR

**JITENDER SINGH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause Nos. 219-81690-2014, 219-82997-2014**

## MEMORANDUM OPINION

Before Justices Bridges, Myers, and Schenck
Opinion by Justice Schenck

Jitender Singh appeals his convictions of burglary of a habitation and fraudulent use or possession of identifying information. In his first issue, Singh challenges the sufficiency of the evidence to support his conviction of burglary of a habitation. In his second issue, he urges that the trial court improperly limited defense counsel's voir dire examination of the jury panel. In his third issue, Singh contends the trial court failed to properly charge the jury. In his fourth and final issue, he challenges the sufficiency of the evidence to support his conviction of fraudulent use or possession of identifying information. We affirm the trial court's judgment. TEX. R. APP. P. 47.4.

## I.    Singh's obsession with P.A. begins

Singh met P.A. in Delhi, India, where both individuals were pursuing their undergraduate studies. The two never dated, but in November 2006, Singh proposed to marry P.A. She declined, explaining that she had no feelings for him. From that day forward, Singh began stalking P.A. and making her life miserable.

Singh began by following P.A. to her parents' home and sitting in a nearby courtyard to watch her. P.A.'s parents called the police when his behavior escalated to knocking on their door. Although he spent that night in jail, he continued his pursuit of P.A. In February 2007, Singh gave P.A. a Valentine's Day card. P.A. repeated to him that she had no feelings for him and that she did not want him to contact her. Singh responded by tearing the card up and throwing it in her face in front of others. Around that same time, P.A. and Singh were attending the same class. One day, after a break in class, Singh asked to sit next to P.A., and she refused. Singh reacted by holding her face in his hands and asking her: "Do you think you're very beautiful that you could decline my proposal?" He then threatened her: "I'm going to get somebody to put acid on your face and spoil this face of yours." On another occasion, Singh asked one of P.A.'s friends to move, so that he could sit next to P.A. in class. P.A. stood up and told him she did not want to sit next to him. Singh reacted by punching his fist into the window next to P.A.'s desk with such force that the glass broke and cut his fist. P.A. reported these incidents to the dean of the school. Singh wrote a letter to the school, acknowledging his wrongful conduct and promising to cease further harassment of P.A. The school took no action toward Singh, and he continued harassing P.A. Because of these multiple threats and harassments, P.A. ceased attending classes for nearly two months, only returning to take her exams to complete her degree.

## II.    Singh continues his harassment of P.A. in the United States

In August 2007, P.A. moved to the United States to pursue her master's degree in New York.  Soon after, Singh applied to universities in the United States, including the same school in New York that P.A. planned to attend.  In the spring of 2008, Singh visited P.A.'s parents' home in Delhi more than once to tell them he wanted to attend the same school as P.A. and threatening to kill them if they did not secure his admission.  In the summer of 2008, Singh visited P.A.'s father's work and physically assaulted him by shoving him against a wall and breaking his glasses. At that point, the Delhi police began providing security for P.A.'s parents and filed criminal charges against Singh for assault and harassment.[1]  In December 2008, an Indian court signed a protective order that permitted Singh to travel to the United States so long as he refrained from contacting P.A. while he was in the United States.

In 2009, P.A. accepted a job in California and moved there.  Singh tracked her down there and—without P.A. providing her phone number or the name of her employer or permission to contact her—began leaving voicemails at her office in violation of the Indian court order.  He escalated his harassment by showing up uninvited to P.A.'s apartment, knocking on her door, and announcing, "You cannot run away from me, I will come back again."  At that point, P.A. felt it was necessary to obtain a restraining order against Singh, and in December 2009, a court in California granted a protective order against Singh.  In retaliation, Singh called P.A.'s mother, informed her that P.A. had obtained a restraining order against him, and said, "I am going to kill her now."  Throughout 2009 to 2012, P.A. discovered multiple accounts created in her name containing false information about her and worded in such a way as to convince her Singh was responsible.  Additionally, someone hacked P.A.'s emails, an action she attributes to Singh.  In

---

[1] Despite court orders prohibiting him from contacting P.A. or her family, Singh never stopped making harassing phone calls to P.A.'s parents.

October 2011, Singh left voicemails for P.A., calling her names, threatening to physically attack her father in India, and accusing her mother of having an affair with police officers.

## III.     Singh's burglary of P.A.'s apartment in Texas

In October 2012, P.A. moved to Collin County. The restraining order P.A. had obtained in California expired in December 2012, and when she applied for a renewal, her request was denied. About a year after the California restraining order expired, Singh became concerned that the charges against him, particularly those in India, would prevent him from traveling back and forth between his work in the United States and his family in India. Singh decided to visit P.A. in Texas to see if he could convince her to drop the charges in India against him or if he could obtain evidence that the allegations against him were false.

Singh flew to Texas, rented a car, and drove to P.A.'s apartment. When he arrived, she was not there, so he checked into a hotel room to stay for the night. The next day, Saturday, February 8, 2014, Singh went to the apartment leasing office and represented to a leasing agent that he was there to deliver papers to a resident. Singh asked to be admitted to the building and began asking for personal information about P.A. When the agent refused to allow Singh to enter or to answer any of Singh's questions, Singh left the leasing office. He saw the gate to the building was open, so he went inside and knocked on P.A.'s apartment door. When no one answered, he then knocked on the door across from P.A.'s apartment, and the resident of that apartment (the "neighbor") answered. Singh asked her if she had seen P.A. She responded that she had not and that he should contact the leasing office or the police with any concerns he might have about P.A. When the neighbor asked for a name to give P.A. if she happened to see her, Singh gave the name "Rakesh."

Later that afternoon, the neighbor heard a drilling sound outside her apartment and looked through the peephole in her door to see a locksmith drilling to open the door to P.A.'s apartment.

–4–

She witnessed Singh calmly walk inside P.A.'s apartment, close the door, and lock it. Suspicious of Singh's intentions towards P.A., the neighbor reported what she had seen and heard to the leasing office and then called the police.

While Singh was inside P.A.'s apartment, P.A.'s boyfriend, N.A., attempted to enter her apartment at P.A.'s request to get some of her belongings for her. N.A. had been able to use P.A.'s key to enter earlier in the day without any trouble, but when he returned that afternoon, he found that he could turn the lock but that the door would not open. P.A. had a roommate, so N.A. called her name. N.A. thought he could hear someone moving inside, but when no one answered his call, he left.

Thirty minutes after he entered P.A.'s apartment, Singh left carrying a backpack. At that time, the neighbor was on the phone with the police and at their request photographed Singh walking through the parking lot and getting into a parked car. Officer Michael Weaver of the Plano Police Department arrived soon after and found Singh sitting in the backseat of his car with his laptop computer and several of P.A.'s possessions, including her backpack, bracelet, multiple external computer drives, mail addressed to P.A., and a variety of personal identification and court documents.

The leasing office notified P.A. of the burglary, and she returned to her apartment to find the police there. The police informed her that Singh was the suspect, and she confirmed that she had not granted him her consent to enter her apartment. P.A. also identified the belongings Singh had taken from her apartment.

When Officer Weaver confronted Singh in his car, he initially denied that he lived at the apartment complex or that he knew anyone there. After Officer Weaver explained Singh had been seen entering P.A.'s apartment, he admitted that he knew P.A. and that he hired a locksmith to drill the door lock. At that point, Officer Weaver decided to detain Singh, so he advised Singh of his

rights. Singh agreed to continue speaking with the officer and informed him that if questioned, P.A. would lie and "do her worst to hang" him. He claimed he and P.A. had been in a relationship in India, but that she was now harassing him by preventing him from returning to India to see his family. He further claimed that he had flown from California to tell her to stop bothering him. When questioned about the belongings found in his car, Singh claimed that they were all his and denied taking a backpack from P.A.'s apartment.[2] Singh stated that he met with P.A. on Friday and that she had given him permission to enter her apartment and to hire a locksmith to drill the lock, but he could not provide a phone number for her or say where she was at that time. He then changed his version of events to say that P.A. would confirm she had given him permission.

The police arrested Singh for burglary of a habitation.

## IV.    Singh's fraudulent use or possession of P.A.'s identifying information

After the burglary, P.A. received a notification from a credit monitoring service that an account in her name was delinquent. P.A. had not opened the account or authorized anyone else to open an account in her name, so she contacted the Plano Police Department. Detective Brenda Speaker with the Plano Police Department's Financial Crimes Units investigated P.A.'s claim and obtained records that a credit monitoring account in P.A.'s name had her address, a previous address, her date of birth, and a social security number. However, the name and credit card information of the person who opened the account belonged to Singh.

## V.    Procedural Background

On July 17, 2014, Singh was indicted for burglary of a habitation, and on December 18, 2014, Singh was indicted for fraudulent use or possession of identifying information. Singh pleaded not guilty to the charges in both indictments. The cases were tried together before a jury who found Singh guilty of both offenses as alleged in the two indictments. The jury then assessed

---

[2] Later at the jail, Officer Weaver noticed P.A.'s bracelet, which Singh informed him was his.

sentences of seventeen years in prison for the burglary offense and two years in the state jail for the fraud offense. The trial court ordered the sentences to run concurrently.

## I. Was the evidence sufficient to support the burglary conviction?

In his first issue, Singh challenges the sufficiency of the evidence to support his conviction for burglary of a habitation. He urges that (1) due to "monomania," he lacked the ability to understand the significance of P.A.'s lack of consent to his entry into her apartment; and (2) there was no evidence that Singh intended to "deprive" P.A. of her property such that he was only guilty of criminal trespass.

### A. *Standard of Review*

When reviewing whether there is legally sufficient evidence to support a criminal conviction, the standard of review we apply is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015), cert. denied, 136 S. Ct. 198 (2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts. *Id.* On appeal, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Id.* Thus, we are not permitted to use a "divide and conquer" strategy for evaluating sufficiency of the evidence because that approach does not consider the cumulative force of all the evidence. *Id.* When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Id.* at 448–49.

### B.     Applicable Law

A person commits burglary of a habitation if the person, without the effective consent of the owner, enters a habitation and (1) does so with the intent to commit a theft or (2) after entry, he commits or attempts to commit a theft.  *See* TEX. PENAL CODE ANN. § 30.02 (a)(1), (3).  A person commits criminal trespass if the person enters the habitation of another without effective consent.  *See id.* § 30.05; *Salazar v. State*, 284 S.W.3d 874, 877–78 (Tex. Crim. App. 2009) (holding that a habitation inherently provides notice that entry is forbidden).  A person commits a theft offense if the person appropriates another's property without the owner's effective consent and with the intent to deprive the owner of the property.  *See* PENAL § 31.03 (a), (b).  The penal code defines "deprive" as meaning (a) to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner; (b) to restore property only upon payment of reward or other compensation; or (c) to dispose of property in a manner that makes recovery of the property by the owner unlikely.  *See id.* § 31.01(2).

### C.     Application of Law to Facts

Singh argues the evidence does not establish he had the intent to commit a theft.  First, he claims the evidence establishes he lacked the ability to understand the significance of P.A.'s lack of consent to his entry into her apartment.  Singh relies on his testimony that he decided to hire a locksmith to break into P.A.'s apartment because he believed it would allow him to obtain evidence to submit to the Indian courts to prove her allegations against him were false.  Once inside P.A.'s apartment, he found a backpack of hers that contained documents.  He became concerned someone would catch him going through P.A.'s documents, so he took the backpack and all its contents to his car to further examine the contents.  Singh also testified that although he did not think P.A.

would have granted him consent to enter her apartment, he believed he had "implied consent."[3] We conclude the foregoing evidence is not sufficient to support Singh's contentions that he lacked the ability to understand the significance of P.A.'s lack of consent to his entry into her apartment.

Moreover, we conclude a factfinder could have relied upon the following evidence to find that Singh in fact understood the significance of P.A.'s lack of consent to his entry into her apartment. Singh testified that if P.A. had found out he had entered her apartment, she would not grant him consent to enter. Before entering her apartment, Singh did not act as though he believed he had "implied consent" to enter her apartment. *See Lincoln v. State*, 307 S.W.3d 921, 924 (Tex. App.—Dallas 2010, no pet.) ("Proof of mental state will almost always depend upon circumstantial evidence."). He lied to the leasing agent in an attempt to gain access to P.A.'s apartment. He asked P.A.'s neighbor if she had seen P.A., and when the neighbor asked for Singh's name, he told her it was "Rakesh," rather than Jitender or Singh. Singh then hired a locksmith to forcibly enter P.A.'s apartment. The locksmith testified he would not have allowed Singh to enter without some proof that he lived there. Since Singh did not live there, a factfinder could conclude any such evidence Singh gave to the locksmith must have been falsified. *See Murray*, 457 S.W.3d at 448–49. While inside her apartment, he did not answer the door when P.A.'s boyfriend knocked and called for P.A.'s roommate. He also testified as to being concerned someone would catch him going through P.A.'s documents. A factfinder could have inferred from the foregoing that Singh understood P.A. did not consent and knew that she would not have consented to his entry and that his use of stealth and deceit to gain entry meant he understood the significance of that lack of consent. *See id.*

Next, Singh argues there was no evidence that Singh intended to "deprive" P.A. of her property such that he was only guilty of criminal trespass. Singh argues he merely wanted to see

---

[3] Singh did not testify further what he meant by "implied consent."

if he could find some evidence to exonerate himself in the Indian courts and that because he only exercised control over the property for less than one hour, the evidence does not establish that he intended to deprive P.A. of her property. As noted above, the penal code defines "deprive" as meaning (a) to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner; (b) to restore property only upon payment of reward or other compensation; or (c) to dispose of property in a manner that makes recovery of the property by the owner unlikely. *See* PENAL § 31.01(2). The record contains sufficient evidence to establish that Singh intended to take P.A.'s property, including the neighbor's testimony that Singh exited P.A.'s apartment with her backpack, which he then took back to his car and proceeded to examine until the police interrupted him. When questioned, Singh at first alleged the backpack and contents belonged to him, indicating his intention to withhold the property from P.A. Officer Weaver testified that at the jail, Singh asserted P.A.'s bracelet was his, from which a jury could conclude that he intended to deprive P.A. of more than simply information he thought might exonerate him of crimes in Indian courts. Further, the fact that his control over the property was brief was only due to the fact that the police caught him with the same property less than an hour after he took it. *See Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981) ("The fact that the deprivation later became temporary does not automatically mean that there was no intent to deprive permanently or for so long as to satisfy the statutory definition.").

We overrule Singh's first issue.

## II. Did the trial court improperly limit Singh's voir dire examination?

A few days before voir dire proceedings, the State filed a motion in limine that in part requested that the trial court instruct defense counsel and Singh not to allude or refer to any mental illness of Singh's during jury selection, opening statements, closing argument, or to solicit

statements regarding same from any witness during the guilt/innocence phase of trial without first requesting a hearing outside the presence of the jury to determine the admissibility thereof. Defense counsel opposed that request as follows.

> [W]e have not pled a defense or given notice of a defense of insanity, so we certainly wouldn't bring it up in voir dire or guilt or innocence. But if he does have any psychiatric issues that would mitigate in punishment, mitigate for intent, mitigate for possibility of reoffense—treated properly, things like that, we think that's allowable as mitigation in sentencing.

The trial court judge granted the motion in limine as to voir dire and to the guilt/innocence phase of trial.

In his second issue, Singh contends the trial court improperly limited his voir dire examination of the venire panel concerning the role that mitigation evidence might play in the assessment of punishment. However, this issue does not comport with the objection Singh raised to the trial court. *See Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016) ("If a trial objection does not comport with arguments on appeal, error has not been preserved."). Moreover, defense counsel explicitly stated he would not "bring [a defense of insanity] up in voir dire" thus disclaiming the very argument Singh now raises on appeal.

Because Singh failed to preserve this second issue, we need not address it.

### III.    Did the trial court submit erroneous jury instructions on the burglary offense?

In his third issue, Singh urges that the jury instructions regarding the burglary of a habitation charge were inadequate because the trial court failed to (1) properly charge the jury on the law of the case pertaining to burglary of a habitation; (2) provide the legal definition of "deprive"; and (3) provide the lesser-included charge of criminal trespass.

#### A.    Standard of Review

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). When, as here, the defendant fails to object

or states that he has no objection to the charge, we will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *Id.* at 743–44. An egregious harm determination must be based on a finding of actual rather than theoretical harm. *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). Actual harm is established when the erroneous jury instruction affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Id.* Thus, we review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Ngo*, 175 S.W.3d at 744. When assessing harm from erroneous jury charge instructions, we examine (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the parties' arguments; and (4) all other relevant information revealed by the record of the trial as a whole. *Arrington*, 451 S.W.3d at 840.

### B. Law of the Case

Singh complains the jury charge erroneously allowed the jury to convict him if they found he committed other conduct proscribed by section 30.02 of the penal code but not alleged in the indictment. As noted above, a person commits burglary of a habitation if the person, without the effective consent of the owner, enters a habitation and (1) does so with the intent to commit a theft or (2) after entry, he commits or attempts to commit a theft. *See* PENAL § 30.02 (a)(1), (3). Singh was indicted as follows.

> [Singh] did . . . intentionally and knowingly enter a habitation, without the effective consent of . . . the owner thereof, and attempted to commit or committed a theft of property . . . .

The jury was charged to convict Singh if they found that he "did then and there intentionally or knowingly, enter a habitation without the effective consent of . . . the owner thereof, with the intent to commit theft, attempt (sic) to commit theft, or did commit a theft." Singh urges that the trial court erroneously instructed the jury that it might find him guilty if it found he entered P.A.'s

apartment with intent to commit theft, which was not alleged in the indictment.[4]   The State concedes that the trial court erred in instructing the jury that it could convict based on the "intent to commit" manner and means of committing the offense.  But the State urges that the error did not egregiously harm Singh.

We agree it was error for the jury charge to authorize a conviction on a theory not alleged in the indictment.  *See Savannah v. State*, No. 05-10-01565-CV, 2012 WL 3125126, at *5 (Tex. App.—Dallas Aug. 2, 2012, pet ref'd) (mem. op., not designated for publication).  We turn now to address whether the error egregiously harmed Singh.

In consideration of the entire jury charge, the jury was indeed permitted to convict Singh if they found that he intentionally or knowingly entered P.A.'s apartment without her effective consent and (1) entered with the intent to commit theft, (2) attempted to commit theft, or (3) committed a theft.  As discussed above, the record contains sufficient evidence for the jury to conclude Singh intended to commit a theft when he entered P.A.'s apartment.  Moreover, the evidence established P.A.'s neighbor witnessed and photographed Singh exiting P.A.'s apartment carrying a backpack later determined to belong to P.A. and to contain her possessions, which is sufficient to establish Singh attempted to commit a theft and that he did so, as alleged in the indictment.  As for the arguments of counsel, during closing argument, defense counsel defined burglary as "when the theft or intent to commit theft occurs."  Further, during voir dire, the State told the jury that they could find Singh guilty of burglary if they found he entered another person's habitation with the intent to commit theft or attempted or actually committed theft.

We conclude that the uncharged theory of burglary (with intent to commit theft) was presented to the jury through evidence and arguments, and the jury charge authorized the jury to

---

[4] Singh also complains about the syntax of the application paragraph and the definition paragraph that defined "burglary" to include "intent to commit a theft while inside the habitation."  However, he does not argue these errors caused any additional harm than that caused by the variance between the indictment and the charge.

convict under that theory as well as the theory authorized by the indictment. The evidence is overwhelming that Singh committed burglary under either theory included in the jury's charge. *See Brown v. State*, Nos. 05-07-00939-CR, 05-07-00940-CR, 05-07-00941-CR, 2010 WL 425063, at *8 (Tex. App.—Dallas Feb. 8, 2010, no pet.) (mem. op.) (not designated for publication) (finding no egregious harm when evidence presented on both theories of burglary). And the jury's guilty verdict suggests that it rejected Singh's defensive theories. *See id.* Thus, we conclude Singh suffered no egregious harm due to this error in the jury charge.

### C. *Legal Definition of "Deprive"*

Singh also complains the jury charge failed to provide the legal definition of "deprive" as set forth in the penal code. He urges this alleged error is particularly harmful because there was no evidence that Singh engaged in conduct meeting any one of the three penal code definitions of "deprive." The penal code defines "deprive" as meaning (a) to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner; (b) to restore property only upon payment of reward or other compensation; or (c) to dispose of property in a manner that makes recovery of the property by the owner unlikely. *See* PENAL § 31.01(2). The State concedes the omission of the definition was error, but contends the error did not egregiously harm Singh.

We agree that the trial court erred by not including the definition of "deprive" in the jury charge. *See Estrada v. State*, 334 S.W.3d 57, 63–67 (Tex. App.—Dallas 2009, no pet.). We turn now to address whether the error egregiously harmed Singh.

As discussed in greater detail above, we have already concluded that the record contains sufficient evidence to establish that Singh intended to deprive P.A. of her property by taking it permanently or for so extended a period of time that a major portion of the value or enjoyment of

–14–

the property is lost to the owner. Accordingly, we cannot conclude that the error in the jury charge caused egregious harm.

### D. Lesser-Included Offense

Finally, Singh urges that the trial court erred by failing to provide the lesser-included charge of criminal trespass. According to Singh, the evidence establishes that he entered P.A.'s apartment without her consent, but that he did not intend to commit a theft and therefore the jury should have been instructed on criminal trespass. Singh did not request this lesser-included instruction. A trial court is not statutorily required to *sua sponte* instruct the jury on lesser-included offenses because these issues frequently depend on trial strategy and tactics. *See Tolbert v. State*, 306 S.W.3d 776, 780 (Tex. Crim. App. 2010). Accordingly, we conclude the trial court did not err by not including criminal trespass in the jury charge.

We overrule Singh's third issue.

## IV. Was the evidence sufficient to support the fraud conviction?

In his fourth issue, Singh challenges the legal sufficiency of the evidence to support his conviction for fraudulent use or possession of identifying information under section 32.51(b) of the penal code. *See* PENAL § 32.51(b). Specifically, Singh complains the State failed to prove when, where, how, or why Singh obtained or possessed items of P.A.'s identifying information without her consent and that such conduct was with the intent to harm or defraud her.

### A. Standard of Review & Applicable Law

As previously noted, when reviewing whether there is legally sufficient evidence to support a criminal conviction, the standard of review we apply is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Murray*, 457 S.W.3d at 448.

A person commits the offense of fraudulent use or possession of identifying information if the person, with the intent to harm or defraud another, obtains, possesses, transfers, or uses an item of identifying information of another person without the other person's consent. *See* PENAL § 32.51(b)(1). The penal code defines "identifying information" to mean information that alone or in conjunction with other information identifies a person, including a person's name, date of birth, and social security number. *See id.* § 32.51(a)(1).

### B.    Application of Law to Facts

The record contains the following information supporting Singh's conviction for fraudulent use or possession of identifying information. P.A. testified that after the burglary, she was notified by a credit monitoring business that an account containing her information required payment to be made. According to P.A., she had not opened any such account, nor had she authorized or requested that anyone else open the account. She reported the unauthorized account to the Plano Police Department. When she learned an account had been opened in her name and that Singh was believed to have opened it, she formed the belief—based on her experience with Singh—that his intent in possessing her identifying information was to harm and defraud her. At trial, the State introduced a business record with P.A.'s identifying information, including her name, address, prior address, social security number, and date of birth. The application also identified the debit card used to pay for the account, which Singh later testified was his. The State also introduced a record of the application to open the credit monitoring account, which contained Singh's name, birth date, and contact information. The investigating detective testified she determined the telephone number Singh provided to police during the burglary investigation was the same as the phone number associated with the debit card used to open the credit monitoring account. Based on her investigation, the detective believed Singh had the intent to harm or defraud P.A.

–16–

Although the detective testified the offense occurred on January 21, 2014, while P.A. was living in Plano, Singh argues there was no evidence he was in Texas prior to the date of the offense to support a finding the offense occurred in Texas. Section 1.04 of the penal code invests Texas with jurisdiction over an offense if the conduct constituting the offense or a result that is an element of the offense occurs inside this state. PENAL § 1.04(a)(1). Because the State established P.A. was living in Texas, Singh's conduct in this offense impacted her financial and personal security in Texas. *See Roberts v. State*, 619 S.W.2d 161, 164 (Tex. Crim. App. 1981) (holding defendant's retention of child outside the state in violation of valid Texas court order had result of frustrating power of Texas judiciary).

Singh urges the evidence that he was the person who obtained or possessed P.A.'s information and that he used his debit card to open a credit monitoring account was not sufficient. He also challenges the evidence that he intended to harm or defraud P.A. We conclude there was sufficient evidence in the record, as detailed above, from which a reasonable factfinder could conclude that Singh was the person who opened a credit monitoring account using P.A.'s information and that he intended to harm or defraud her. *See Murray*, 457 S.W.3d at 448–49.

We overrule Singh's fourth issue.

## CONCLUSION

We affirm the trial court's judgment.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

DO NOT PUBLISH
TEX. R. APP. P. 47

160610F.U05

–17–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

JITENDER SINGH, Appellant

No. 05-16-00610-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-81690-2014.
Opinion delivered by Justice Schenck, Justices Bridges and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 5th day of February, 2018.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JITENDER SINGH, Appellant

No. 05-16-00611-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-82997-2014.
Opinion delivered by Justice Schenck, Justices Bridges and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 5th day of February, 2018.